SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff,

v.

TEXAS GULF SULPHUR COMPANY, Charles F. Fogarty, Richard D. Mollison, Richard H. Clayton, Walter Holyk, Kenneth H. Darke, David M. Crawford, Claude O. Stephens, Thomas P. O'Neill, Earl L. Huntington and Harold B. Kline, Defendants.

No. 65 Civ. 1182.

United States District Court,
S. D. New York.

Feb. 6, 1970.

Philip A. Loomis, Jr., David Ferber, Frank E. Kennamer, Jr., Robert E. Kushner, Harvey A. Rowen, Stuart A. Morse, Securities and Exchange Commission, Washington, D. C., New York City, for plaintiff.

White & Case, New York City, for defendants, Orison S. Marden, William D. Conwell, P. B. Konrad Knake, Thomas McGaney, Jeffrey A. Barist, New York City, of counsel.

## OPINION

BONSAL, District Judge.

### I. Introduction

This action was instituted by the Securities and Exchange Commission (SEC) pursuant to Section 21(e) and 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78u(e) and 78aa (the 1934 Act), against Texas Gulf Sulphur Company (TGS) and several of its officers, directors, and employees. The SEC alleged violations of Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. 240.10b–5, promulgated pursuant thereto. The complaint alleged that from November 12, 1963 through April 16, 1964 certain of the defendants had purchased TGS stock or calls or recommended it to others, or acquired stock options, on the basis of material inside information concerning the results of TGS's exploration activities near Timmins, Ontario, while such information remained undisclosed to the investing public, the Stock Option Committee, and to TGS shareholders who sold during the period, and that on April 12, 1964, TGS issued a false and deceptive press release with respect to these activities.

All parties agreed that the trial should first be had on the issue of whether the defendants or any of them had violated Section 10(b) or Rule 10b–5, reserving for later hearing the issue of the remedy to be applied in the event such violations were found.

The issue of liability was tried by this court and the court's opinion is reported at 258 F.Supp. 262 (S.D.N.Y. 1966). The Court of Appeals affirmed in part and reversed and remanded in part, 401 F.2d 833 (2d Cir. 1968), cert. denied, Coates v. Securities and Exchange Commission, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), holding that the defendants who purchased TGS stock or calls, or who recommended such purchases to others, or accepted stock options, before the material information as to the Timmins drill results was disclosed had violated Section 10(b) and Rule 10b–5. The Court of Appeals directed that this court reconsider the April 12 press release (the press release) in light of its opinion.

Beginning on October 6, 1969, this court held a hearing to:

(a) receive further evidence regarding the press release and its interpretation by the reasonable investor; and

(b) determine the remedy to be accorded the SEC with respect to the defendants found to have violated Section 10(b) and Rule 10b–5.

The events which led to this litigation are set forth in detail in the opinion of the Court of Appeals, 401 F.2d at 840–841, 843–847, and in the opinion of this court, 258 F.Supp. at 268–275, 293–294.

### II. The April 12, 1964 Press Release

On Sunday, April 12, 1964, at about 3:00 P.M., TGS issued the following press release:

For Immediate Release

TEXAS GULF SULPHUR COMMENT ON TIMMINS, ONTARIO, EXPLORATION

NEW YORK, April 12—The following statement was made today by Dr. Charles F. Fogarty, executive vice

president of Texas Gulf Sulphur Company, in regard to the company's drilling operations near Timmins, Ontario, Canada. Dr. Fogarty said:

"During the past few days, the exploration activities of Texas Gulf Sulphur in the area of Timmins, Ontario, have been widely reported in the press, coupled with rumors of a substantial copper discovery there. These reports exaggerate the scale of operations, and mention plans and statistics of size and grade of ore that are without factual basis and have evidently originated by speculation of people not connected with TGS.

"The facts are as follows. TGS has been exploring in the Timmins area for six years as part of its overall search in Canada and elsewhere for various minerals—lead, copper, zinc, etc. During the course of this work, in Timmins as well as in Eastern Canada, TGS has conducted exploration entirely on its own, without the participation by others. Numerous prospects have been investigated by geophysical means and a large number of selected ones have been core-drilled. These cores are sent to the United States for assay and detailed examination as a matter of routine and on advice of expert Canadian legal counsel. No inferences as to grade can be drawn from his procedure.

"Most of the areas drilled in Eastern Canada have revealed either barren pyrite or graphite without value; a few have resulted in discoveries of small or marginal sulphide ore bodies.

"Recent drilling on one property near Timmins has led to preliminary indications that more drilling would be required for proper evaluation of this prospect. The drilling done to date has not been conclusive, but the statements made by many outside quarters are unreliable and include information and figures that are not available to TGS.

"The work done to date has not been sufficient to reach definite conclusions and any statement as to size and grade of ore would be premature and possibly misleading. When we have progressed to the point where reasonable and logical conclusions can be made, TGS will issue a definite statement to its stockholders and to the public in order to clarify the Timmins project."

Texas Gulf Sulphur, the world's leading sulphur supplier, has conducted a continuing program of exploration for many years all over the world, searching not only for sulphur, but for oil and gas, metallic sulphides, potash, phosphate, trona and other minerals. This program has been successful, resulting in a broad diversification program from essentially a one-product company. In Moab, Utah, TGS has under way a $40 million potash operation which will be the largest in this country and is expected to start operating this year. The company recently announced a $45 million program to develop phosphate reserves at Lee Creek in North Carolina. The company is also drilling extensively for oil and gas in Western Canada and has other activities under way in trona.

April 12, 1964

The press release was reported on the Dow Jones broad tape and in the Wall Street Journal, the New York Herald Tribune, and other morning newspapers throughout the country on April 13, 1964.

The SEC has contended that the press release was materially false and misleading in view of the facts as to the exploratory activities at Timmins at the time of its issuance, and hence violated Rule 10b–5(2) which provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

\* \* \* \* \* \*

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the state-

ments made, in the light of the circumstances under which they were made, not misleading,

\* \* \*

\* \* \* \* \* \*

in connection with the purchase or sale of any security."

In interpreting the "in connection with" requirement of Rule 10b–5, the Court of Appeals held that:

"\* \* \* Rule 10b–5 is violated whenever assertions are made, as here, in a manner reasonably calculated to influence the investing public \* \* \* if such assertions are false or misleading or are so incomplete as to mislead irrespective of whether the issuance of the release was motivated by corporate officials for ulterior purposes." 401 F.2d at 862.

To determine whether the press release was false and misleading, the Court of Appeals directed this court to make "an appropriate primary inquiry into the meaning of the statement to the reasonable investor and its relationship to truth." Ibid.[1] The Court of Appeals stated that, "The speculators and chartists of Wall and Bay Streets are also 'reasonable' investors entitled to the same legal protection afforded conservative traders." Id. at 849. From the record before it, the Court of Appeals could not,

"by applying the standard Congress intended, definitively conclude that it was deceptive or misleading to the reasonable investor, or that he would have been misled by it. \* \* \* Accordingly, we remand this issue to the district court that took testimony and heard and saw the witnesses for a

determination of the character of the release in the light of the facts existing at the time of the release, by applying the standard of whether the reasonable investor, in the exercise of due care, would have been misled by it.

"In the event that it is found that the statement was misleading to the reasonable investor it will then become necessary to determine whether its issuance resulted from a lack of due diligence." Id. at 863. (Emphasis added.)

*Character of the Release*

At the hearing, the court heard the testimony of seven witnesses and received the depositions of 28 witnesses taken prior to the hearing. Twenty shareholders testified that they sold their shares from April 12 through April 16, 1964 because of the press release. Twelve shareholders testified that they retained their shares or purchased shares after they became aware of the press release. The shareholders stated that they heard of the press release from the Dow Jones broad tape or accounts in the Wall Street Journal or their daily newspapers, published on April 13, 1964, or from their brokers who had obtained the information from these sources.

The shareholders who sold their shares testified that they were misled by certain words in the press release such as "without factual basis,"[2] "misleading,"[3] "premature,"[4] and "exaggerated,"[5] which indicated to them that the rumors as to the Timmins discovery were unfounded[6] and that there was either no discovery or, if there was, it was not as rich as it was rumored to be.[7]

---

1. A summary of the exploratory activities at Timmins is set forth in 258 F.Supp. at 269–273 and 401 F.2d at 843–844, 846–847, and are analyzed in 401 F.2d at 862, n. 28.

2. Stotler, Clement, Weinstein, Kane.

3. Stotler, Patenaude, Clement, Kuhlmann, Harutun, Wentworth, Jahss, Kane.

4. Patenaude, Clement, Kuhlmann, Harutun, Jahss.

5. Jay, Weinstein, Ostroff.

6. Stotler, Kane.

7. Jay, Jahss, Kuhlmann.

Nine of the shareholders who sold[8] offered reasons similar to those given by Wentworth who testified:

"Well, I had noticed that the market on this particular stock was moving up for some little time before that, several weeks, at least * * *. And I was curious to know what was causing it, and I supposed at the time that it was because they anticipated larger earnings, maybe increased dividends from their sulphur, potash, and phosphate operations * * *. Now * * * when I read this statement in the Wall Street Journal, an officer of the company, I think his name was Fogarty, he mentioned that these rumors —I'm not quoting his exact words, but my recollection of it—he mentioned that these rumors were misleading. I don't remember his exact words, but the substance he was saying was they were not reliable and misleading. Then I woke up to the fact that this increase in the stock was due to the street rumor, probably, that they had made a find in the Timmins area, and according to my recollection, that stock did dip some at that time.[9] And I decided that the stock had peaked due to these rumors and that instead of holding the stock as it was my original intention, I had better sell it and buy when it went lower."

Shareholders who retained their shares or purchased shares testified that they noted such words as "preliminary"[10] and the promise of a later "definite statement"[11] or considered the press release as a whole. Funk, who purchased shares after reading the Wall Street Journal account of the press release, testified that, "you don't really pick out a line of an article, you have to read between the lines * * * and the total nature of this article was just a cautious approach * * *."

Whereas some shareholders seized upon the words "premature and possibly misleading" to indicate that TGS had no discovery, others testified that these words meant that TGS "had something" but "that they [TGS] didn't know exactly what."[12] Similarly, witness Jay had seized upon the word "exaggerated" to indicate that TGS had no discovery, while Mann testified as to "exaggerated":

"Well, it wasn't that part of the statement that I regarded as optimistic, but I think he was referring to the criticism that Canadian authorities were making which were published, that there were all kinds of wild rumors, not only of Texas Gulf Sulphur, but of many other mining companies in Canada, and the market was going too high, there was no basis for it."

All of the shareholders appear to have been reasonable investors as that term has been defined by the Court of Appeals, and all were influenced by the press release, some selling their shares, and others holding their shares or purchasing shares.

Finding that the witnesses were reasonable investors, the court is next directed to determine whether those who sold their shares were misled by the press release. The Court of Appeals stated that, "Examined in retrospect, the situation in Timmins at the time the release was prepared seems to offer good reason for optimism." *Id.* at 862, n. 28. In his concurring opinion, Judge Friendly found that, "To say that the drilling at Timmins had afforded only 'preliminary indications that more drilling would be required for proper evalua-

8. Feeley, Stotler, Patenaude, Kuhlmann, Jay, Harutun, Borden, Ostroff, Kane.

9. Whereas the price of TGS did begin to drop after April 13, movement of TGS stock prices was nearly identical to that of Freeport Sulphur and Pan American Sulphur. The closing prices on the three stocks on April 10, 13, 14, and 15, 1964, were as follows: TGS (30⅛, 30⅞, 30¼, 29⅜—drop of ¾); Freeport (38½, 39½, 39, 38—drop of ½); Pan American (33⅞, 33⅞, 32⅞, 32¼—drop of 1⅝).

10. Rhodes, Gwynne, Mann.

11. Gwynne, Crowley, Mann.

12. Shimberg, Wochnik.

tion of this prospect,' was a wholly insufficient statement of what TGS knew * * *." *Id.* at 866. Judge Hays, concurring in part and dissenting in part, held that, " * * * the evidence establishes as a matter of law that the press release was misleading. Indeed, if the correct standard is applied, the finding of the trial court requires the conclusion that the press release was misleading * * *." *Id.* at 869. Also, the press release has been held to be " * * * misleading, intentionally deceptive, inaccurate, and knowingly deficient in material facts pertaining to the results of drilling." Reynolds v. Texas Gulf Sulphur Co. 309 F.Supp. 566 (D.Utah, October 17, 1969). Revised opinion filed January 13, 1970.

■ The testimony of the witnesses who sold their shares at a time when the situation in Timmins "seem[ed] to offer good reason for optimism" establishes that they sold because of the press release, and that they were misled by it. It was not necessary that the SEC establish that the selling shareholders were influenced to sell their shares solely because of the press release. It is enough that it materially influenced the shareholders' conduct and was a substantial factor in bringing about their sales. *See* Prosser, Law of Torts, § 103, p. 730 (1964).

■ The court must next determine whether the reasonable investors who were misled by the press release would have been so misled had they exercised due care. TGS argues that no reasonable investor exercising due care would have been misled and caused to sell his stock on the basis of the press release. Emphasizing the promise of a "definite

statement" at a future time "[w]hen we have progressed to the point where reasonable and logical conclusions can be made, * * *" TGS urges that the exercise of "due care" required that the shareholders await the further statement before selling their shares. Kane testified, however, that he decided to sell and not await the promised statement because:

"I decided that the statement as issued April 12th and quoted in the Wall Street Journal on April 13th, was emphatic enough and strong enough for me to base an investment decision on."

Since the press release had misled reasonable investors to believe that there was no ore discovery, or if there was, it was not as rich as it was rumored to be, they were entitled to act without awaiting a second release.

■ Therefore, the court finds that some reasonable investors, exercising due care, were misled by the press release.

*Due Diligence*

There remains the question whether the framers of the press release failed to exercise due diligence.[13] The Court of Appeals stated that:

"In the event that it is found that the statement was misleading to the reasonable investor it will then become necessary to determine whether its issuance resulted from a lack of due diligence." *Id.* at 863.

However, the majority opinion goes on to say:

"It is not altogether certain from the present record that the draftsmen could, as the SEC suggests, have readily obtained current reports of the

---

13. "The trial court did not find it necessary to decide whether TGS exercised such diligence and has not yet attempted to resolve this issue. While the trial court concluded that TGS had exercised 'reasonable *business* judgment under the circumstances' 258 F.Supp. at 296 (emphasis supplied) it applied an incorrect *legal* standard in appraising whether TGS should have issued its April 12 release

on the basis of the facts known to its draftsmen at the time of its preparation, 258 F.Supp. at 295, and in assuming that disclosure of the full underlying facts of the Timmins situation was not a viable alternative to the vague generalities which were asserted. 258 F.Supp. at 296." *Id.* at 863. (emphasis in original.)

drilling progress over the weekend of April 10–12, but they certainly should have obtained them if at all possible for them to do so. However, even if it were not possible to evaluate and transmit current data in time to prepare the release on April 12, it would seem that TGS could have delayed the preparation a bit until an accurate report of the rapidly changing situation was possible. See 258 F.Supp. at 296. At the very least, if TGS felt compelled to respond to the spreading rumors of a spectacular discovery, it would have been more accurate to have stated that the situation was in flux and that the release was prepared as of April 10 information rather than purporting to report the progress "to date." Moreover, it would have obviously been better to have specifically described the known drilling progress as of April 10 by stating the basic facts. Such an explicit disclosure would have permitted the investing public to evaluate the "prospect" of a mine at Timmins without having to read between the lines to understand that preliminary indications were favorable—in itself an understatement.

"The choice of an ambiguous general statement rather than a summary of the specific facts cannot reasonably be justified by any claimed urgency. The avoidance of liability for misrepresentation in the event that the Timmins project failed, a highly unlikely event as of April 12 or April 13, did not forbid the accurate and truthful divulgence of detailed results which need not, of course, have been accompanied by conclusory assertions of

success. Nor is it any justification that such an explicit disclosure of the truth might have 'encouraged the rumor mill which they were seeking to allay.' 258 F.Supp. at 296." Id. at 863–864.

Judge Friendly, in his concurring opinion, stated that the press release " * * * was a wholly insufficient statement of what TGS knew," Id. at 866, and Judge Hays, concurring in part and dissenting in part, added:

" * * * since Fogarty and those who assisted him in the preparation of the press release were aware of the drilling results to which the district court's finding refers, they obviously did not use due diligence in the preparation of the misleading press release." Id. at 869–870.

From the foregoing, it appears that a majority of the Court of Appeals were of the view that the framers of the press release failed to exercise due diligence. No additional evidence was presented at the hearing supporting TGS's contention that the framers exercised due diligence.

■ While the Court of Appeals recognizes that " * * * the timing of disclosure is a matter for the business judgment of the corporate officers * * *.", Id. at 850, n. 12, when a company chooses to issue a press release to respond to spreading rumors regarding its activities, it must describe the true picture at the time of the press release, which should include the basic facts known, or which reasonably should be known to the draftsmen of the press release, enabling the investing public to make a reasonable appraisal of the existing situation.[14]

14. Where technical geological data is involved, consideration should be given to a recent release of the SEC regarding the effect of corporate disclosure upon the investing public in the related petroleum field. Portions of the release, issued on October 20, 1969, and entitled, "Publicity Concerning Petroleum Discoveries on North Slope of Alaska," follow:

"The Securities and Exchange Commission today expressed its concern with the effect which publicity being given the oil and gas discoveries in the North Slope area of Alaska may have upon public investors. Such publicity may stimulate public interest and give rise to estimates of potential values beyond justification by the factual information now available. * * *

"Oil companies which have oil exploration and development interests on the North Slope are cautioned to weigh carefully the conclusions and interpretations of information they may use in

■■ On the basis of the standards laid down by the Court of Appeals, this court finds that the framers of the press release failed to exercise due diligence. Therefore, the press release is found to have been misleading to the reasonable investor using due care, and since the framers did not exercise due diligence in its issuance, TGS violated Section 10(b) and Rule 10b–5.

TGS contends that it can only be held responsible for the press release itself, not for the "inaccurate or incomplete" versions carried by the news media, and emphasizes that none of the witnesses who sold their shares actually saw the press release. TGS refers in particular to the Dow Jones broad tape transmission of April 13, which follows:

"April 13, 1964

"TEXAS GULF SULPHUR

"TEXAS GULF SULPHUR CO CALLED REPORTS THAT IT HAS DISCOVERED A LARGE LODE OF RICH COPPER ORE IN CANADA— PREMATURE AND POSSIBLY MISLEADING—RUMORS OF A GIANT COPPER STRIKE NEAR TIMMINS ONTARIO CAUSED HEAVY TRADING IN MINING STOCKS FRIDAY ON THE TORONTO STOCK EXCHANGE—CHARLES F FOGARTY EXECUTIVE VICE PRESIDENT OF TEXAS GULF SULPHUR ISSUED A STATEMENT SAYING THE REPORTS—EXAGGERATE THE SCALE OF OPERATIONS AND MENTION PLANS AND STATISTICS OF SIZE AND GRADE OF ORE THAT ARE WITHOUT FACTUAL BASIS AND HAVE EVIDENTLY ORIGINATED BY SPECULATION OF PEOPLE NOT CONNECTED TITH [sic] TGS—"

TGS claims that the Dow Jones paragraph is an incomplete restatement of the press release. In particular, the company points to the omission of its promise that "[w]hen we have progressed to the point where reasonable and logical conclusions can be made, TGS will issue a definite statement * * *."

TGS also contends that the Wall Street Journal distorted the release by taking the words "without factual basis" out of context and using them as a sub-headline, which the company thinks may have given the impression that they had denied even the possibility that a strike might be proven through further drilling.

■ By issuing the press release "For Immediate Release," TGS was depending on the news media to report it to its shareholders. They could not have expected the news media to publish the entire press release, but only those portions which the media deemed important. Had TGS considered it important that its shareholders be presented with the full text of the press release, TGS could have sent individual copies to each shareholder through the mails.

Indeed, the fact that the news media emphasized the words which have been found to be misleading to the reasonable

statements released to the public * * * which describe the results of exploration and drilling programs which have been carried out.

"It is the policy of the Commission to encourage prompt disclosure of material developments in the affairs of publicly owned companies. Such disclosure, however, should not be false or misleading. * * *

" * * * Investors unfamiliar with the technical aspects of the oil and gas business—and these may include most shareholders of major oil companies— could ignore or misconstrue the difference between categories of reserves and would attribute to any numerical estimates of reserves in other categories [than 'proved'] a degree of certainty which is not warranted.* While the absence of proved reserve does not preclude factual disclosures of exploratory activities such as information relating to drilling operations, any statements which are made should be appropriately qualified to indicate the limitations upon the significance of the facts disclosed."

* See Sunray DX Oil Co. v. Helmerich & Payne, Inc., 398 F.2d 447 (10th Cir. 1968).

investor merely indicates that the news media also deemed them of importance. The failure of the broad tape to mention that a later statement would be issued indicates only that Dow Jones considered it relatively unimportant. No evidence was adduced at the hearing to establish unfair treatment by the news media.

### Application for an Injunction

■ Having found that TGS violated Section 10(b) and Rule 10b–5, the court must now determine whether the SEC is entitled to an injunction. The SEC seeks a permanent injunction, pursuant to Section 21(e) of the 1934 Act, restraining TGS from violating Section 10 (b) and Rule 10b–5 in connection with the issuance of future corporate announcements to the public. Section 21 (e) provides in pertinent part:

"Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule or regulation thereunder, it may in its discretion bring an action in the proper district court of the United States * * * to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted * * *."

The Supreme Court has made it clear that "the cessation of violations whether before or after the institution of a suit * * * is no bar to the issuance of an injunction * * *" and that the issuance of an injunction is subject to principles of equitable discretion. Hecht Co. v. Bowles, 321 U.S. 321, 327, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

Section 21(e) requires that "a proper showing" be made before a permanent injunction may be granted. In S.E.C. v. Culpepper, 270 F.2d 241, 249 (2d Cir. 1959), the Court of Appeals stated that, "The critical question for the court in cases such as this is whether there is a reasonable expectation that the defendants will thwart the policy of the Act by engaging in activities proscribed thereby." Mr. Justice Clark observed in United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L. Ed. 1303 (1953):

"The case may nevertheless be moot if the defendants can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.' The burden is a heavy one. * * *

"Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct. The purpose of an injunction is to prevent future violations, and, of course, it can be utilized even without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." (citations omitted.)

Professor Loss has suggested that, "The ultimate test is whether the defendant's past conduct indicates * * * that there is a reasonable likelihood of further violations in the future." 3 Loss, Securities Regulation, 1976 (1961).

In its earlier opinion this court stated:

"[I]t is apparent that the purpose of the April 12 press release was an attempt to meet the rumors which were circulating with respect to the Kidd 55 segment.

 * * * * * *

"Moreover, the circumstances under which the April 12 release was prepared indicate that the defendants Fogarty and Mollison were under considerable pressure. If they had said too much, they would have been open to criticism and possible liability if it turned out that TGS had not discovered a commercial mine. If they said too little and later announced a mine, they subjected themselves to the charge that their press release was misleading or deceptive—and, indeed, this is what has happened. If they

had announced the drilling results in terms of number of drill holes, footage drilled and mineralization intersected, they would have encouraged the rumor mill which they were seeking to allay. Perhaps they should have waited until they could have obtained more probative information before issuing a press release, particularly since developments were breaking so rapidly. However * * * TGS must not be judged by hindsight. In seeking the advice of Mollison, the head of TGS's exploration group, in consulting with TGS's public relations firm, and in clearing the release with one of TGS's lawyers, Stephens and Fogarty exercised reasonable business judgment under the circumstances." 258 F. Supp. at 294, 296.

In the Court of Appeals, Judge Friendly observed in his concurring opinion that while the press release did not properly convey the information in the hands of the draftsmen on April 12,

"[I]t does not necessarily follow that this is an appropriate case for granting an injunction as to future press releases. * * * Here there is no danger of repetition of an unduly gloomy press release like that of April 12. The essence of the SEC's case is that Timmins was a once-in-a-lifetime affair; the company's motive in issuing the release was laudable; and the defect was solely a pardonable one of execution." 401 F.2d at 868–869.

▮▮▮ The issuance of an injunction is inappropriate absent a showing of lack of good faith. "Scienter and Rule 10b–5," 69 Col.L.Rev. 1057, 1076 (1969); 82 Harv.L.Rev. 938, 947–48 (1969).

Finally, the Court of Appeals' "due diligence" test is here being applied for the first time.

On the record here, there is no "proper showing" that there is any reasonable likelihood of future violations by TGS of Section 10(b) and Rule 10b–5. The press release was issued over five years ago, and no subsequent misleading press releases have been called to the court's attention.

Accordingly, the SEC's application for "the issuance of a final judgment permanently enjoining the defendant TGS * * * from issuing, publishing, distributing or otherwise disseminating materially false, misleading, inadequate, or inaccurate press releases and other communications and reports concerning material facts about TGS's activities and operations" is denied.[15]

*III: Remedy as to the Individual Defendants*

This court found that defendants Clayton and Crawford had violated Section 10(b) and Rule 10b–5 in that they purchased TGS stock on the basis of material inside information concerning the results of TGS drilling in Timmins, Ontario, while such information remained undisclosed to the investing public. The Court of Appeals affirmed this court's determination as to Clayton[16] and Crawford and in addition ruled: (1) that defendants Fogarty, Mollison, Darke, Huntington, Holyk, and Coates had violated Section 10(b) and Rule 10b–5 in that they purchased TGS stock or calls on the basis of material undisclosed information; (2) that defendants Darke and Coates[17] had violated Section 10(b) and Rule 10b–5 in that they recommended the purchase of TGS stock to others while the material information was undisclosed to the investing public; and

15. This renders it unnecessary to consider TGS's defense that the issuance of an injunction would violate the company's rights under the First Amendment.

16. While this court found that only Clayton's purchase on April 15, 1964 was a violation of Section 10(b) and Rule 10b–5, the Court of Appeals held that all of his purchases during the period of nondisclosure, from November 12, 1963 through April 16, 1964, were violations of these provisions.

17. A stipulation was signed by the parties settling the SEC's action against Coates, and a judgment was entered pursuant thereto on October 2, 1969.

(3) that defendants Stephens, Fogarty, and Kline had violated Section 10(b) and Rule 10b–5 in that they accepted stock options without disclosing the material information to the Stock Option Committee or the Board of Directors of TGS.[18]

There remains for determination the appropriate remedy to be applied to these defendants.

*Defendants Who Purchased or Recommended Purchases of Stock or Calls*

With respect to the defendants who were found to have violated Section 10(b) and Rule 10b–5 in that they purchased TGS stock or calls or recommended its purchase to others while in possession of material undisclosed inside information, the SEC urges that the court:

1) issue an order under Section 21(e) of the 1934 Act enjoining,

Injunctive Relief—

a) defendants Clayton, Holyk, Huntington, Darke, Fogarty, Crawford, and Mollison from violating Section 10(b) and Rule 10b–5 in connection with their purchases or sales of the securities of TGS (or calls in TGS securities) on the basis of material undisclosed inside information;

b) defendant Darke from recommending the purchase of TGS stock while in possession of material undisclosed inside information; and

Other Relief—

2) decree that defendants Clayton, Holyk, Huntington, and Darke be deprived of the profits they realized through their use of material undisclosed inside information and that defendant Darke be required to pay an amount equal to the profits of those persons who purchased TGS stock on his recommendation or that of his "tippees." [19]

◆

*Injunctive Relief*

The SEC asserts that the defendants' past violations were not accidental or inadvertent, but knowing, and that the fact that defendants continue to maintain that they have done nothing wrong creates a reasonable expectation that such violations will occur in the future unless an injunction issues. Moreover, the SEC points out that all these defendants, with the exception of Darke, still hold important positions with TGS —positions which presumably bring material confidential information to their attention.

On the other hand, these defendants emphasize that the only transactions for which they have been held to have violated Rule 10b–5 occurred more than five years ago and that there is no evi-

18. Defendant O'Neill has not appeared or answered. A motion by the SEC to enter a default judgment against him was denied by this court without prejudice to its renewal following final disposition of the appeal, and the SEC renewed its motion of September 26, 1969. Disposition of the motion will be the subject of a separate memorandum.

19. As defendants Fogarty, Mollison, and Crawford have sold the shares which they purchased from November 12, 1963 through April 16, 1964 to TGS at cost, the SEC seeks no relief other than an injunction with respect to them.

dence that since that time they have violated the securities laws, or are about to violate them. Defendants rely on Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944) and Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 947 (2d Cir. 1969), for the proposition that, "The historic injunctive process was designed to deter, not to punish." It would be inappropriate, these defendants say, to enjoin them "for failing to have the prescience to know that their conduct would be adjudged unlawful under a statute and rule which did not expressly prohibit that conduct and which had not previously been interpreted to prohibit it." Finally, defendants urge the court to consider the punishment they have already suffered by reason of the wide adverse publicity.

In considering the remedy of injunction, it is noted that defendant Darke is a Canadian living in Canada. He is no longer in the employ of TGS, and hence no longer privy to any material inside information with respect to its activities. The material undisclosed information possessed by Darke when he made his purchases and recommended TGS securities to others was disclosed in the April 16, 1964 press release announcing TGS's discovery. The SEC seeks injunctions only with respect to trading in TGS securities on the basis of TGS material undisclosed information. Since Darke no longer has the opportunity, no useful purpose would be served by the issuance of an injunction, but the SEC will be accorded "other relief" to the extent hereinafter provided.

Defendants Holyk, Huntington, Fogarty, and Mollison are still in the employ of TGS. The record makes it clear that the discovery on the Kidd 55 segment was a once-in-a-lifetime affair. The violations occurred more than five years ago, and there is no evidence that any of these defendants have been guilty of further violations. Professor Painter points out that the application of the "materiality" test by the Court of Appeals "represents a considerable exten-sion of the meaning of 'materiality' into new areas." Painter, Federal Regulation of Insider Trading, 220 (1968). These defendants could not have anticipated this extension at the time of their violations, but they, as indeed all insiders, are now on notice of the scope of Section 10(b) and Rule 10b–5. It is believed that the wide publicity accorded to these defendants will serve as an adequate deterrent, when coupled with the fact that none of these defendants will retain the profits which they realized by reason of their violations. Fogarty and Mollison have surrendered to TGS, at their cost, the shares which they purchased, and by the application of the "other relief" sought by the SEC, Holyk and Huntington will be deprived of any profit they made by reason of their violations. The purpose of an injunction is to deter and not to punish. Hecht Co. v. Bowles, *supra;* Electronic Specialty Co. v. International Controls Corp., *supra.*

For the foregoing reasons, finding no reasonable likelihood of further violations, injunctions will not issue with respect to defendants Darke, Holyk, Huntington, Fogarty, and Mollison.

 Defendants Clayton and Crawford are in a different position because they purchased during the period of nondisclosure knowing beyond peradventure of a doubt that TGS had made a very important mineral discovery. Because of this and reasons hereinafter stated, injunctions will issue with respect to them.

### Other Relief

The SEC urges the court to deprive defendants Darke, Holyk, Huntington, and Clayton of their profits in order to remove any monetary reward for violations of Section 10(b) and Rule 10b–5.

The defendants contend that the SEC's only remedy is for an injunction or restraining order under Section 21(e), and that this court has no power to direct "other relief," whether or not ancillary to an injunction.

Judicial willingness to imply new remedies in areas governed by federal law has been expressed in a number of ways. *See* Comment, "SEC Enforcement of the Rule 10b–5 Duty to Disclose Material Information—Remedies and the Texas Gulf Sulphur Case," 65 Mich.L.Rev. 944, 945–54 (1967).

When such relief has been necessary for the protection of the investing public, the courts have utilized their inherent equity power to grant relief ancillary to an injunction. Thus a receiver was appointed ancillary to an injunction under Section 21(e) in S.E.C. v. H. S. Simmons & Co., 190 F.Supp. 432 (S.D. N.Y.1961), and in S.E.C. v. Quing N. Wong, 252 F.Supp. 608, 613 (D.P.R. 1966), the court, denying defendant's motion to dismiss that portion of the SEC's complaint seeking an accounting and restitution, stated that, "Where appropriate, this Court may utilize its inherent equitable powers, invoked by an injunctive action under Section 36 [of the Investment Company Act, 15 U.S.C. § 80a–35], to do justice and grant full relief."

Ancillary relief in other areas [20] indicates that the doctrine is sufficiently well established to support the relief here sought by the SEC if the congressional purpose is effectuated by so doing. *See,* 65 Mich.L.Rev., *supra* at 946–48; 3 Loss, *supra* at 1827–28; Cary, Book Review, 75 Harv.L.Rev. 857, 861 (1962); "Ancillary Relief in SEC Injunction Suits for Violation of Rule 10b–5," 79 Harv.L. Rev. 656 (1966).

In Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), the Supreme Court held that the congressional grant of jurisdiction in Section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, "authorize[d] federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements * * *." *Id.* at 451, 77 S.Ct. at 915, and that the law to be applied in such suits "is federal law, which the courts must fashion from the policy of our national labor laws." *Id.* at 456, 77 S.Ct. at 918.

This action was instituted pursuant to Section 27 of the 1934 Act, which provides:

"The district courts of the United States * * * shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder."

In J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964), the Supreme Court, invoking the *Lincoln Mills* rationale, and basing its determination on Section 27 rather than on either the ancillary or statutory tort doctrines, stated that:

" * * * it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose. * * * It is for the federal courts 'to adjust their remedies so as to grant the necessary relief' where federally secured rights are invaded."

The Supreme Court recently followed this rationale in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (Jan. 20, 1970). The Court concluded that proxies necessary to the approval of a merger were obtained by means of a materially misleading solicitation. 396 U.S. at 386, 90 S.Ct. at 622. In stating that the conclusion implied nothing about the form of the relief to which plaintiffs were entitled, Justice Harlan went on to say:

"We held in *Borak* that upon finding a violation the courts were 'to be alert

---

**20.** Porter v. Warner Holding Co., 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946) —Emergency Price Control Act of 1942; Mitchell v. Robert DeMario Jewelry, Inc.,

361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960)—Fair Labor Standards Act of 1938.

to provide such remedies as are necessary to make effective the congressional purpose,' noting specifically that such remedies are not to be limited to prospective relief. 377 U.S., at 433, 434 [84 S.Ct. 1555, 1560, 12 L.Ed.2d 423]. * * * In selecting a remedy the lower courts should exercise 'the sound discretion which guides the determination of courts of equity,' keeping in mind the role of equity as 'the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.' Hecht Co. v. Bowles, 321 U.S. 321, 329–330 [64 S.Ct. 587, 591–592, 88 L.Ed. 754] (1944)." *Ibid.*

In contrasting the Lanham Act, Justice Harlan said:

"[W]e cannot fairly infer from the Securities Exchange Act of 1934 a purpose to circumscribe the courts' power to grant appropriate remedies." 396 U.S. at 391, 90 S.Ct. at 625.

As this court has recently stated in Astor v. Texas Gulf Sulphur Co., 306 F. Supp. 1333, 1341 (S.D.N.Y.1969) (Oct. 31, 1969):

"The power of the federal courts to 'adjust their remedies' where Rule 10b–5 has been violated, J. I. Case Co. v. Borak, *supra* at 433, 84 S.Ct. 1555, may be invoked in situations of 'inherent unfairness * * * where a party takes advantage of [undisclosed corporate] information knowing it is unavailable to those with whom he is dealing, Cady, Roberts & Co., 40 S.E.C. 907, 912 (1961)."

▮ Therefore, the court may, on the basis of Section 27, fashion an appropriate remedy to effectuate the purpose of the 1934 Act, and to deter future violations of Section 10(b) and Rule 10b–5. 65 Mich.L.Rev., *supra* at 954.

The congressional purpose is stated in Section 2 of the 1934 Act (15 U.S.C. § 78b), which provides in part:

"[T]ransactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest which makes it necessary * * * to insure the maintenance of fair and honest markets in such transactions."

In Berko v. S. E. C., 316 F.2d 137, 141 (2d Cir. 1963), the Court of Appeals, discussing the 1934 Act, remarked:

"[I]t is important to remember that the Commission is charged with the duty of enforcing the statute in the 'public interest,' * * * and that its orders are intended to be remedial rather than penal, a result of the fact that the 'design of the statute is to protect investors' and the general public in this specialized field."

▮ In seeking to deprive the defendants of their profits in order to remove any monetary reward for violating Section 10(b) and Rule 10b–5, the SEC is urging this court to provide a remedy which, in accord with the congressional purpose of the 1934 Act, will protect the investing public by providing an effective deterrent to future violations. *See,* 65 Mich.L.Rev., *supra* at 963. Accordingly, the court may require the defendants to give up profits realized in transactions which violated Section 10 (b) and Rule 10b–5.[21]

Defendants contend that even if this court has the power, the SEC's "other relief" should be denied in the court's discretion. They assert that, "[I]f a sum of money is to be recovered by a third person for violation of a statute instead of the person injured * * * it constitutes a penalty * * *" Bowles v. Farmers National Bank, 147 F.2d 425,

---

21. On October 30, 1969, Judge Weinfeld of this Court entered a judgment, based upon a stipulation between the parties, enjoining future violations and directing the defendants to surrender their profits in S.E.C. v. Golconda Mining Co.,

¶92,504 CCH Fed.Sec.L.Rep. 98,357 (S.D. N.Y.1969), an action alleging that defendants violated Section 10(b) and Rule 10b–5 by trading on the basis of inside information.

428 (6th Cir. 1945), and that, "Anything which savors of a penalty should not be permitted unless Congress has expressly so provided, since the spirit of equity abhorred such punitive measures." United States v. Parkinson, 240 F.2d 918, 922 (9th Cir. 1956). Defendants also point out that the amount of their profits which the SEC seeks to deprive them of exceeds the statutory maximum fine which could have been levied upon them if they had been found guilty of a criminal violation.

However, as stated by the New York Court of Appeals in Diamond v. Oreamuno, 24 N.Y.2d 494, 498, 301 N.Y.S.2d 78, 81, 248 N.E.2d 910, 912 (1969),

"[T]here can be no justification for permitting officers and directors, such as the defendants, to retain for themselves profits which * * * they derived solely from exploiting information gained by virtue of their inside position as corporate officials."

 In its complaint filed in this action, the SEC sought rescission and restitution with respect to defendants who purchased TGS stock or recommended its purchase to others while in possession of material undisclosed information. The SEC now urges that the court follow the formula established in its settlement with defendant Coates, which was approved by this court on October 2, 1969. The Coates settlement provided that he would pay to TGS the estimated amount of "profit" based upon the difference between market price on April 17, 1964 and the price at which the stock was purchased on April 16, 1964. The settlement was $26,250. of which $16,575. represented the "profit" on the stock purchased by Coates for his family trusts, and $9,675. represented the "profit" on stock purchased by Coates' "tippees."

In applying this formula, the SEC proposes that the amount to be paid by each defendant would be the difference between the mean average price of TGS common stock on the New York Stock Exchange on April 17, 1964, which has been stipulated by the parties to be 40⅜, and the purchase price of their shares, and in the case of calls, the aggregate of the purchase price and the cost of exercise, with interest from April 17, 1964 at the New York legal rate.[22]

The payments would be made to TGS to be held in escrow in an interest-bearing account for a period of three or more years, subject to disposition in such manner as the court might direct upon application by the SEC or other interested person or on the court's own motion. At the end of the period any money remaining undisposed of would become the property of TGS.[23]

The formula proposed by the SEC is approved as fair. TGS announced its major discovery on the morning of April 16, 1964. The news was widely disseminated by the news media and was available to the investing public on April 17, 1964.[24]

The court believes that the application of the SEC formula to the extent hereinafter provided with respect to each in-

22. It has been stipulated that prior to July 1, 1968, the New York legal rate was 6%; from July 1, 1968 to February 16, 1969 it was 7¼%; and since February 16, 1969, has been 7½%.

23. The Coates settlement included the following provision:
"* * * except that if Coates or his estate shall incur liability to any person or entity by reason of his purchases of Texas Gulf stock on April 16, 1964, or the purchases of said stock by H. Fred Haemisegger and his customers, as a result of a judgment in or settlement of any other action commenced prior to the date hereof, Texas Gulf will, at the request of Coates or his estate, apply any or all of the remaining balance of said amount toward the satisfaction of such liability."

24. In Reynolds v. Texas Gulf Sulphur Co., *supra*, the court used the average of the highest prices on the 20 days following the April 16, 1964 press release as the standard for computing the damages of plaintiffs who sold their TGS stock in reliance on the April 12, 1964 press release.

dividual defendant will protect the investing public by deterring possible future violations of Section 10(b) and Rule 10b–5. To the payments hereinafter directed to be made, interest will be added at the rate of 6% per annum from April 17, 1964, and the payments will be escrowed by TGS for a period of 5 years.

Each of these defendants will now be considered:

*Darke*—Defendant Darke was a geologist and a member of TGS's exploration group on the Kidd 55 segment. During the period of nondisclosure, from November 12, 1963 through April 16, 1964, Darke made the following purchases:

| Date of Purchase | Shares | | Calls | |
| | Number | Price | Number of Shares | Cost of Exercise |
| --- | --- | --- | --- | --- |
| 2/20/64 | 300 | 24⅛ | | |
| 2/27/64 | | | 1,000 | 22⅝–22¾ |
| 3/23/64 | | | 1,000 | 24¾ |
| 3/30/64 | | | 1,000 | 25½ |

Darke purchased a total of 300 shares and calls on 3,000 shares. Under the SEC formula, his cost is figured at $91,-442.58. The price on April 17, 1964, was $133,237.50. Accordingly, Darke will be directed to pay the difference of $41,-794.92 to TGS.

During the period of nondisclosure, Darke recommended the purchase of TGS securities to the following persons, whose purchases were as follows:

| Date of Purchase | Purchaser | Shares | | Calls | |
| | | Number | Price | Number of Shares | Cost of Exercise |
| --- | --- | --- | --- | --- | --- |
| 12/30/63 | Caskey | | | 300 | 22¼ |
| 2/17/64 | Atkinson | 50 | 23¼ | 200 | 23⅛ |
| 3/3/64 | E. W. Darke | | | 500 | 22½–22⅝ |
| 3/17/64 | E. W. Darke | | | 200 | 23⅜ |
| 3/30/64 | Atkinson | | | 400 | 25¾–25⅞ |
| 3/30/64 | Caskey | 100 | 25⅞ | 1,000 | 25¾–25⅞ |
| 3/30/64 | E. W. Darke | | | 200 | 25½ |

During the period of nondisclosure, the following persons purchased TGS securities on the basis of recommendations received directly or indirectly from Caskey or Atkinson:

| Date of Purchase | Purchaser | Shares | | Calls | |
| | | Number | Price | Number of Shares | Cost of Exercise |
| --- | --- | --- | --- | --- | --- |
| 1/16/64 | Westreich | 2,000 | 21¼–21¾ | | |
| 2/17/64 | Westreich | 50 | 23¼ | 1,000 | 23¼–23⅝ |
| 2/24/64 | Miller | | | 200 | 23¾ |
| 2/25/64 | Miller | | | 300 | 23⅜–23½ |
| 3/30/64 | Klotz | | | 2,000 | 25½–26⅛ |
| 3/30/64 | Miller | | | 500 | 25½–25⅞ |
| 3/30/64 | Westreich | 500 | 25¾ | | |

As to Darke's "tippees," this court stated:

"Toward the end of December, 1963, Darke visited Caskey and Atkinson in Washington. The evidence shows no more than that Darke indicated to them that he thought TGS was a good buy. There is no direct evidence that Darke again communicated with any of his 'tippees,' but the record shows that on March 30, 1964 Darke and his 'tippees,' Atkinson, Caskey, E. W. Darke, Klotz, Miller, and Westreich, purchased substantial amounts of TGS stock and calls on TGS stock. As the Commission points out, this is strong circumstantial evidence that Darke must have passed the word to one or more of his 'tippees' that drilling on the Kidd 55 segment was about to be resumed." 258 F.Supp. at 284.

The Court of Appeals added:

"Obviously if such a resumption were to have any meaning to such 'tippees,' they must have previously been told of K-55-1.

" * * * As it is our holding that the information acquired after the drilling of K-55-1 was material, we, on the basis of the findings of direct and circumstantial evidence on the issue that the trial court has already expressed, hold that Darke violated Rule 10b-5(3) and Section 10(b) by 'tipping' and we remand, pursuant to the agreement of the parties, for a determination of the appropriate remedy. 401 F.2d at 852 (footnote omitted).

The SEC urges that Darke be required to pay an amount equal to the profits of his "tippees." According to the SEC's calculations, the profit of Darke's "tippees" which is attributable to him was $141,818.14, as follows:

| "Tippee" | Total Cost | Price on 4/17/64 | Profit Attributable to Darke |
|---|---|---|---|
| Caskey | $31,772.74 | $ 56,525.00 | $ 24,752.26 |
| Atkinson | 17,841.43 | 26,243.75 | 8,402.32 |
| E. W. Darke* | 21,087.50 | 36,337.50 | 15,250.00 |
| Westreich | 86,275.05 | 143,331.25 | 57,056.20 |
| Klotz | 56,770.32 | 80,750.00 | 23,979.68 |
| Miller | 27,997.32 | 40,375.00 | 12,377.68 |
| | | | $141,818.14 |

In considering "other relief" with respect to Darke's "tippees," a distinction will be made between those who purchased TGS securities on Darke's recommendation and those who purchased on the recommendation of one of Darke's "tippees."

In this court's opinion it will be a sufficient deterrent if Darke is directed to pay to TGS the profits realized by the "tippees" who purchased on Darke's recommendation (E. W. Darke, Caskey, and Atkinson) in accordance with the SEC formula.

E. W. Darke, Caskey, and Atkinson purchased a total of 150 shares and calls on 2,800 shares. Under the SEC formula, their cost is figured at $70,701.67. The price on April 17, 1964, was $119,106.25, and Darke will be directed to pay the difference of $48,404.58 to TGS —subject to adjustment if Darke fur-

---

* E. W. Darke, the brother of defendant Darke, is a Canadian resident. The SEC has been unable to determine both the cost of the calls purchased by E. W. Darke and whether these calls were exercised. Since the price of TGS stock rose appreciably above the exercise price of these calls, the SEC has assumed that they were exercised.

nishes the exact figures as to his brother's purchases of calls and evidence as to whether his brother exercised them—which amount is in addition to the $41,794.92 Darke will be directed to pay with respect to his own purchases.

*Holyk*—Defendant Holyk was the chief geologist in TGS's exploration group on the Kidd 55 segment. During the period of nondisclosure, Holyk [25] made the following purchases:

| Date of Purchase | Shares Number | Price | Calls Number of Shares | Cost of Exercise |
|---|---|---|---|---|
| 11/29/63 | 50 | 18 | | |
| 12/10/63 | 100 | 20⅜ | | |
| 12/12/63 | | | 200 | 21 |
| 1/6/64 | | | 100 | 23⅝ |
| 1/24/64 | | | 200 | 22¼–22⅜ |
| 2/24/64 | | | 200 | 24⅛ |
| 2/26/64 | | | 200 | 23⅜ |
| 3/2/64 | 200 | 22⅜ | | |
| 3/16/64 | | | 300 | 23¼ |
| 3/17/64 | 100 | 23⅞ | | |
| 3/30/64 | 100 | °25⅞ | | |

Prior to the drilling at Kidd 55, Holyk owned no TGS stock, with the exception of 50 shares which he sold prior to December, 1962.

Holyk purchased a total of 550 shares and calls on 1,200 shares. Under the SEC formula, his cost is figured at $34,992.78. The price on April 17, 1964 was $70,656.25, and Holyk will be directed to pay the difference of $35,663.47 to TGS.

*Huntington*—Defendant Huntington was a lawyer employed by TGS. During the period of nondisclosure, Huntington made the following purchases:

| Date of Purchase | Shares Number | Price | Calls Number of Shares | Cost of Exercise |
|---|---|---|---|---|
| 2/26/64 | 50 | 23¼ | | |
| 3/16/64 | | | 100 | 22⅜ |

Prior to the drilling at Kidd 55, Huntington owned 50 shares of TGS stock.

Huntington purchased a total of 50 shares and calls on 100 shares. Under the SEC formula, his cost is figured at $3,755.69. The price on April 17, 1964 was $6,056.25, and Huntington will be directed to pay the difference of $2,300.56 to TGS.

25. Several of Holyk's purchases of shares and calls were in the name of his wife or in the names of both spouses. Both this court and the Court of Appeals have treated such transactions as purchases in the defendant's name alone.

*Clayton*—Defendant Clayton was employed by TGS as an engineer. During the period of nondisclosure, Clayton made the following purchases:

| Date of Purchase | Shares | |
| --- | --- | --- |
| | Number | Price |
| 11/15/63 | 200 | 17¾ |
| 2/24/64 | 400 | 23⅞ |
| 3/3/64 | 100 | 22¼ |
| 3/26/64 | 200 | 25 |
| 4/1/64 | 60 | 26½ |
| 4/2/64 | 100 | 26⅞ |
| 4/15/64 | 200 | 29⅜ |

Clayton conducted geophysical surveys including surveys on the Kidd anomaly. While he did not participate in the drilling, he spent a great deal of his time at Timmins and at the Kidd 55 segment, and the evidence establishes that he kept himself fully informed. He testified at a pre-trial examination that he thought that, with the results of K–55–6, TGS had a potential ore body. By 7:00 P.M. on April 13, 1964, K–55–6 had been drilled to 949 feet, encountering substantial mineralization. Indeed, no further mineralization was encountered by K–55–6 after that time. Therefore, this court found that Clayton's April 15 purchase violated Section 10(b) and Rule 10b–5, 258 F.Supp. at 286–287, and the Court of Appeals has ruled that his prior purchases also violated these provisions. In view of the evidence, and in order to deter future violations, Clayton will be enjoined from making any further purchases or sales of TGS securities on the basis of material undisclosed information.

Clayton purchased a total of 1,260 shares of stock at a cost of $30,861.94. Under the SEC formula, the price of these shares on April 17, 1964, was $50,-872.50, and Clayton will be directed to pay the difference of $20,010.56 to TGS.

*Crawford*—Defendant Crawford was a lawyer who was employed by TGS in January, 1964, and was appointed secretary of the company and manager of its public relations on February 20, 1964.

During the period of nondisclosure Crawford made the following purchases:

| Date of Purchase | Shares | |
| --- | --- | --- |
| | Number | Price |
| 4/16/64 | 600 | 30⅛–30¼ |

On April 15, 1964, Crawford participated with defendant Fogarty and a representative of Doremus & Co. in the preparation of the April 16 press release announcing TGS's discovery. The evidence establishes that by the evening of April 15 he was fully familiar with the contents of the press release which was to be issued the following morning.

About midnight on April 15, Crawford telephoned his broker and ordered 300 shares of TGS to be purchased at the opening of the market the next morning. He telephoned his broker again at about 8:30 A.M. on April 16 to increase his order from 300 to 600 shares. This court found that Crawford sought to, and did, "beat the news," and that in so doing, he utilized material undisclosed information to his own advantage in violation of Section 10(b) and Rule 10b–5, 258 F.Supp. at 287. In view of the evidence, and in order to deter future violations, Crawford will be enjoined from making any further purchases or sales of TGS securities on the basis of material undisclosed information.

As Crawford has surrendered to TGS, at his cost, the shares which he purchased, the SEC seeks no "other relief," and the court finds no "other relief" to be necessary. (This is also the case with respect to defendants Fogarty and Mollison—See footnote 19.)

### Defendants Who Accepted Stock Options

The Court of Appeals ruled that defendants Stephens, Fogarty, and Kline had violated Section 10(b) and Rule 10b–5 in that they accepted options to purchase TGS stock while they possessed material information which they did not disclose to the Stock Option Committee

or the Board of Directors. The SEC urges that the court:

1) issue an order enjoining defendants Stephens, Fogarty, and Kline from violating Section 10(b) and Rule 10b–5 in connection with the acceptance of options to purchase TGS stock while they possess material undisclosed inside information; and

2) issue an order directing TGS to rescind the option to purchase TGS stock granted to defendant Kline, and directing TGS to cancel his option.

### Stephens and Fogarty

Defendants Stephens and Fogarty have surrendered their stock options, which have been cancelled by TGS.

This court stated that Stephens and Fogarty "were under a duty to inform the [Stock Option] Committee of material information affecting the issuance of the stock options." 258 F.Supp. at 292.

The Court of Appeals, finding that the information which Stephens and Fogarty possessed was material, directed this court "to consider in its discretion whether to issue injunction orders against Stephens and Fogarty." 401 F. 2d at 864. Judge Hays thought that "the injunction sought by the Commission [with respect to Stephens and Fogarty] should be granted." Id. at 869.

In his summation, Mr. Kennamer, counsel for the SEC, stated:

"This is to my knowledge the first case where the Commission has brought an enforcement proceeding involving the issuance of stock options—that is, an enforcement proceeding under Rule 10b–5."

The SEC points out that Stephens as Chief Executive, and Fogarty as President, are privy to non-public material information concerning TGS, and assert that "all of the ingredients [for further violations of Section 10(b) and Rule 10b–5] are present." The SEC argues that the failure to inform the Stock Option Committee of material information affecting the issuance of the stock options breached a well recognized duty which raises the inference of future violations. Therefore, the SEC seeks an injunction with respect to Stephens and Fogarty.

However, since Stephens and Fogarty have surrendered their stock options to TGS, they have realized no profit by reason thereof. In view of the wide publicity given to this case and the reporting requirements of the 1934 Act, there seems to be little likelihood that these senior officers of TGS would accept future stock options without disclosing what they know to the Stock Option Committee and the Board of Directors. For these reasons, injunctions will not issue with respect to defendants Stephens and Fogarty.

### Kline

This court found that Kline was not in the possession of material undisclosed information at the time he accepted his stock option, stating:

"Defendant Kline was informed by defendants Stephens and Fogarty at lunch in November 1963 that TGS was conducting explorations in the Timmins area and that the completion of the first drill hole was a favorable development; that it was on the boundary of the TGS property and that TGS was interested in acquiring additional property. He knew no details and his only information came from his superiors." 258 F.Supp. at 291.

The Court of Appeals, finding that the information which Kline possessed was material and that he was under a duty before accepting his option to disclose any material information he may have possessed, "direct[ed] that an order issue rescinding the option granted Kline and that such further remedy be applied against him as may be proper by way of an order of restitution." 401 F.2d at 864. This is the only instance

where the Court of Appeals directed a specific remedy as to any of the defendants, it having previously stated:

"Pursuant to a stipulation by all the parties, the question of the appropriate remedies to be applied was deferred pending a final determination whether the defendants or any of them had violated Section 10(b) and Rule 10b–5 and therefore that question is not now before us." *Id.* at 839, n. 1.

While this court believes that the remedy directed with respect to Kline merits reconsideration in the event the matter is again presented to the Court of Appeals, this court is bound by its directions. Therefore, the judgment to be entered will direct Kline to surrender to TGS his stock option heretofore granted on February 20, 1964 covering 4,300 shares of stock, and will direct TGS to rescind and cancel Kline's stock option.

In seeking an injunction against Kline as to future violations, the SEC asserts that "the failure of Kline, who was then Secretary and is now General Counsel of Texas Gulf, to divulge his knowledge concerning the drilling in Timmins to the Stock Option Committee or Board of Directors before accepting stock options, raises the inference that future violations may be reasonably expected, and therefore an injunction should issue." For the reasons stated with respect to defendants Stephens and Fogarty, there seems little likelihood that Kline will accept future stock options without disclosing what he knows. Therefore, the SEC's application for an injunction is denied.

From what has been said in this opinion, it should be clear that if any of the defendants not here enjoined should again violate Section 10(b) and Rule 10b–5, the remedy of injunction, in addition to other remedies, would be appropriate.

The foregoing, together with this court's opinion reported at 258 F.Supp. 262, and the Court of Appeals' opinions reported at 401 F.2d 833, constitutes the court's findings of fact and conclusions of law. Rule 52(a), F.R.Civ.P.

The parties may settle final judgments in accordance herewith.

It is so ordered.