**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**NATIONAL STUDENT MARKETING CORPORATION et al., Defendants.**

**Civ. A. No. 225–72.**

United States District Court,
District of Columbia.
March 22, 1973.

See also, D.C., 59 F.R.D. 305.

Theodore Sonde, David H. Belkin, and Mark Q. Connelly, Washington, D. C., for the SEC.

David Ginsburg, Lee R. Marks, and Ronald P. Wertheim, Washington, D. C., for Cameron Brown.

Sherwin J. Markman, Robert M. Jeffers, Anthony S. Harrington, and Stanley J. Marcuss, Washington, D. C., for Lord, Bissell & Brook, Max E. Meyer, and Louis F. Schauer.

Francis M. Shea, Washington, D. C., for Robert P. Tate.

William J. Bach, Bloomington, Ill., for William J. Bach and Paul E. Allison.

Milton V. Freeman, Abe Krash, and Daniel A. Rezneck, Washington, D. C., for White & Case, and Marion J. Epley, III.

## MEMORANDUM OPINION

PARKER, District Judge.

Alleging violations and aiding and abetting in violations of the anti-fraud,[1] proxy [2] and reporting [3] sections of the securities laws, the Securities and Exchange Commission ("SEC" or "Commission") has brought suit for injunctive relief [4] against National Student Marketing Corporation ("NSMC"),[5] its

---

1. § 17(a) of the Securities Act of 1933, ("Securities Act"), 15 U.S.C. § 77q(a); § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j (b) and Rule 10b-5 thereunder, 17 C.F.R. 240. 10b-5.

2. § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a).

3. § 13(a) of the Exchange Act, 15 U.S.C. § 78m(a).

4. §§ 20(b) and (c) of Securities Act, 15 U.S.C. §§ 77t(b) and (c); §§ 21(e) and (f) of the Exchange Act, 15 U.S.C. §§ 78u (e) and (f).

5. A Judgment of Permanent Injunction was entered against NSMC on July 27, 1972.

officers, directors, outside legal counsel and independent auditors and the officers, directors, and legal advisers of Interstate National Corporation ("Interstate"), a company which was merged into NSMC, seeking to prevent future violations of those laws.

Defendants White & Case, a New York City law firm which at all relevant times was NSMC's outside legal adviser, and Marion Jay Epley, III ("Epley"), a partner in that firm, have requested this Court pursuant to Rule 12 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1406 to enter an order dismissing the proceedings on the grounds that venue is improper as to them in the District of Columbia and that *in personam* jurisdiction is lacking. Alternatively, these. defendants pursuant to Rule 21 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 1406(a) and 1404(a) have moved to sever and transfer the claims against them to the United States District Court for the Southern District of New York.

Defendants Cameron Brown ("Brown"), at all relevant times the president and a director of Interstate, Lord, Bissell & Brook, a Chicago Law firm which represented Interstate, Max E. Meyer ("Meyer"), a partner in that firm and a director of Interstate, and Louis F. Schauer ("Schauer"), also a member of Lord, Bissell & Brook, have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the proceedings for failure to state a claim upon which relief can be granted. Alternatively these defendants move for summary judgment in their favor pursuant to Rules 12(b) and 56 of the Federal Rules. Defendants Paul E. Allison ("Allison"), Robert P. Tate ("Tate") and William J. Bach ("Bach"), all of whom were directors of Interstate,

have likewise requested this Court to grant summary judgment in their behalf pursuant to Rules 12(b) and 56.

The Court, after careful consideration of the memoranda of points and authorities, affidavits, exhibits and the representations of counsel during oral argument and for the reasons set forth below, denies the motions of White & Case, Epley, Brown, Lord, Bissell & Brook, Meyer and Schauer. The motions of Allison, Bach and Tate are granted and summary judgment is entered in their favor.[6]

### The Background

In this proceeding the Commission has set forth a pleading, the First Amended Complaint For Injunctive and Other Relief, which contains four claims. The First Claim of the Amended Complaint, which does not involve any of the movants, recounts an alleged mammoth securities fraud scheme perpetrated by the principal officers, directors and accountants of NSMC and details the purchase and sale of over eleven million shares of NSMC stock between 1968 and 1970. Lying at the heart of this alleged scheme is the preparation, issuance, dissemination and promotion of false and misleading financial statements [7] which artificially inflated the price of NSMC stock and enabled NSMC to fraudulently acquire approximately twenty-five companies in exchange for its own stock.

A significant portion of the remainder of the Amended Complaint concerns the October, 1969 acquisition of Interstate by NSMC. During the spring and summer of 1969 Interstate, an Illinois corporation, explored the possibility of merging with NSMC, which at the time was a District of Columbia corporation.[8] Interstate engaged the investment banking firm of White, Weld & Company

---

6. At oral argument on these motions the Court indicated it would initially enter orders to be followed by a memorandum opinion. Orders were previously entered on March 7, 1973.

7. The financials include proxy and registration statements and annual reports filed

in the District of Columbia with plaintiff Commission. Included within the alleged scheme are press releases and speeches dealing with NSMC's financial position.

8. NSMC was a District of Columbia corporation until April, 1970. It is presently incorporated in Delaware.

("White, Weld") to make an investigation into the background, history and finances of NSMC, and to make recommendations as to the advisability of the merger. A preliminary report on NSMC, presented to the Interstate Board of Directors on August 12, 1969, and a final draft, dated September 22, 1969, were generally favorable to the merger.[9] An Agreement and Plan of Merger ("Merger Agreement") was executed by the Interstate Board of Directors on August 15, 1969. The Merger Agreement, which was subject to Interstate and NSMC shareholder approval, contained, *inter alia*, the following significant provisions: Interstate was to receive from NSMC's counsel, White & Case, an opinion letter satisfactory to Lord, Bissell & Brook, that NSMC had taken all actions required of it by law and that all transactions in connection with the merger had been duly and validly taken; NSMC would receive from Lord, Bissell & Brook, a similar letter satisfactory to White & Case, that Interstate had taken all necessary steps to effectuate the transaction and that the merger was reached in accordance with law; and Peat, Marwick, Mitchell & Co. ("PMM") as NSMC's independent accountants would issue to Interstate a "comfort letter" stating that there was no reason to believe that NSMC's unaudited nine month financial statements for the period ending May 31, 1969 were not prepared in accordance with standard and accepted accounting procedures or that any material adjustments in those financials were required. It was further understood that the letter would indicate that NSMC had experienced no material adverse change in its financial posture from May 31, 1969, until five days prior to the effective date of the merger.

After receiving and having the opportunity to review the proxy material mailed to them, which included copies of the proposed agreement, shareholders of each corporation approved the merger at specially held meetings in early October, 1969. The material mailed to Interstate stockholders included the required nine month financial statements of NSMC which reflected a profit of approximately $700,000.

The closing meeting took place at the office of White & Case in New York on Friday afternoon, October 31, 1969. In attendance were representatives of NSMC; officers and directors of Interstate, including Brown, Allison, Bach and Tate; Meyer, Schauer representing Lord, Bissell & Brook; and Epley on behalf of White & Case. During the progress of the meeting PMM telephonically transmitted from its Washington, D. C. office to White & Case an unsigned draft of the comfort letter which was to be prepared in accordance with the Merger Agreement. Providing less than the anticipated degree of comfort, the letter, which had been typewritten and distributed to those present at the closing, noted in pertinent part that:

"our examination in connection with the year ended August 31, 1969 which is still in process, disclosed the following significant adjustments which in our opinion should be reflected retroactive to May 31, 1969:

1. In adjusting the amortization of deferred costs at May 31, 1969, to eliminate therefrom all costs for programs substantially completed or which commenced 12 months or more or prior, an adjustment of $500,000 was required. Upon analysis of the retroactive effect of this adjustment, it appears that the entire amount could be determined applicable to the period prior to May 31, 1969.

2. In August 1969 management wrote off receivables in amounts of $300,000. It appears that the uncollectibility of these receivables could have been determined at May 31, 1969 and such charge off should have been reflected as of that date.

---

9. Pertinent provisions of the White, Weld report are discussed at pp. 297–299 *infra*.

3. Acquisition costs in the amount of $84,000 for proposed acquisitions which the Company decided not to pursue were transferred from additional paid-in capital to general and administrative expenses. In our opinion, these should have been so transferred as of May 31, 1969."

On the date of closing but prior to consummation of the merger PMM allegedly informed White & Case and Epley of its desire to add to the draft letter an additional paragraph to the effect that with the noted adjustments properly made, NSMC's unaudited consolidated statement for the nine month period would not reflect a profit as had been indicated but rather a net loss and the consolidated operations of NSMC as it existed at May 31, 1969, would show a break-even as to net earnings for the year ended August 31, 1969. It is averred that White & Case and Epley did not inform the others of this information. Despite the unexpected revelations of the comfort letter, and without its contents being disclosed by any of the defendants who had knowledge of such, the merger was completed on schedule and the Articles of Merger were filed and recorded in the Corporation Division of the Office of the Recorder of Deeds of the District of Columbia. The final copy of the comfort letter which was received by White & Case approximately one hour after the closing was consummated and by the Interstate representatives several days after closing did in fact contain two supplemental paragraphs:

"Your attention is called, however, to the fact that if the aforementioned adjustments had been made at May 31, 1969, the unaudited consolidated statement of earnings of National Student Marketing Corporation would have shown a net loss of approximate-

ly $80,000. It is presently estimated that the consolidated operations of the company as it existed at May 31, 1969, will be approximately a break-even as to net earnings for the year ended August 31, 1969.

In view of the above mentioned facts, we believe the companies should consider submitting corrected interim unaudited financial information to the shareholders prior to proceeding with the closing." [10]

After receiving the contents of the comfort letter counsel for both companies rendered legal opinions, as required of them by the Merger Agreement, that all transactions in connection with the merger had been duly and validly taken.

The gravamen of the SEC's charges against the attorney defendants, as they relate to the events of October 31, is found in ¶ 48(i) of the Second Claim:

"As part of the fraudulent scheme White & Case, Epley, Lord, Bissell & Brook, Meyer and Schauer failed to refuse to issue their opinions . . . and failed to insist that the financial statements be revised and shareholders be resolicited, and failing that, to cease representing their respective clients and, under the circumstances, notify the plaintiff Commission concerning the misleading nature of the nine month financial statements."

The Interstate shareholders were not apprised of PMM's suggested adjustments to NSMC's financials. The SEC maintains that such concealment by Brown, Meyer,[11] Allison, Bach and Tate constituted conduct proscribed by the securities laws and so charges in ¶ 48(f) of the Amended Complaint.

Defendants White & Case and Epley are further charged in the Second Claim with continuing in their attempts to conceal the nature of the comfort letters by

10. The contents of the second paragraph were allegedly related by PMM to White & Case and Epley one hour after the closing had been completed.

11. Meyer was a director of Interstate at the time of the alleged violation.

transmitting to the Commission a Form 8–K report for the month of October 1969 which, by reason of its omission of any reference to the letters' contents, was materially false and misleading.

The Third Claim alleges that on the day of closing Brown, Meyer, Allison, Bach and Tate furthered their participation in the fraudulent scheme by selling a portion of NSMC stock they had acquired as a result of the merger without publicly disclosing the new information they had received earlier that day concerning NSMC's financials. Lord, Bissell & Brook, through Meyer and/or Schauer, and at the request of White & Case, rendered an opinion as to the legality of these sales. The failure of the opinion to make mention of the comfort letter and the possible necessity of its disclosure before the stocks would be sold, serves as the basis for the charges brought against both groups of attorneys in this Claim.

The Fourth Claim, which does not relate to the Interstate-NSMC merger, charges White & Case with issuing to their client a materially false and misleading opinion concerning the sale of two NSMC subsidiaries. Finally, White & Case and Epley are alleged to have participated in the preparation of a false and misleading annual report which was filed with the Commission in the District of Columbia.

## MOTION OF WHITE & CASE AND EPLEY TO DISMISS BECAUSE OF IMPROPER VENUE AND LACK OF IN PERSONAM JURISDICTION

Section 22 of the Securities Act of 1933 establishes venue, for any suit arising thereunder ". . . in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the offer or sale took place, if the defendants participated

therein . . . ." [12] Venue under Section 27 of the Securities Exchange Act of 1934 may properly be laid in any district "wherein any act or transaction constituting the violation occurred . . . or in the district wherein the defendant is found or is an inhabitant or transacts business . . . ." [13]

■ The Commission, while not conceding the inapplicability of the other delineated criteria, defends its choice of venue under the 1934 Act by reason of the occurrence within the District of Columbia of acts or transactions constituting the violation. Since it has been held repeatedly that venue properly laid for claims arising under either of the securities acts satisfactorily establishes venue for those arising under the other,[14] the Court need only be concerned with the issue as narrowly drawn by the Commission.

In opposing the defendants' motions the Commission advances alternative positions. Initially it argues that venue as to White & Case and Epley is properly before this Court because of those defendants' violative conduct within the District of Columbia. The defendants respond and contend that the conduct attributable to them and upon which the Commission relies occurred either in New York City or can not be considered as violative acts or transactions proscribed by the statute.

■ The SEC alternatively relies upon what the parties have described as the "co-conspirator" theory of venue. Plainly stated, this doctrine provides that in a multi-defendant securities proceeding, where a common scheme of acts or transactions to violate the securities acts is alleged, if venue is established for any of the defendants in the forum district there is sufficient justification to establish venue as to the other defendants, even in the absence of any

12. 15 U.S.C. § 77v.

13. 15 U.S.C. § 78aa.

14. *See* Zorn v. Anderson, 263 F.Supp. 745 (S.D.N.Y.1966) and cases and authorities cited therein.

contact or substantial contact by any one defendant within that district.[15]

White & Case and Epley claim that the wrongdoing, if any, of which they are accused was pursued in their representative capacity as attorneys and that they are not and were never principals in nor beneficiaries of any alleged fraudulent scheme. They contend that there is no authority to support the Commission's theory that attorneys serving in representative capacities can be held accountable under the co-conspirator theory. Accordingly, they have urged the Court to distinguish the facts as related to them from those in which the co-conspirator doctrine has been accepted and applied. Further, they assail the use of the doctrine in this instance as being dangerously expansive because of its possible serious implications for members of securities law bar and for attorneys who appear before other administrative agencies in the District of Columbia.

The Court however is satisfied as to the appropriateness and applicability of the co-conspirator doctrine and on that basis alone rules that venue as to White & Case and Epley is properly lodged.[16] It is well recognized that in multi-defendant and multi-forum securities fraud actions any act committed material to and in furtherance of an alleged fraudulent scheme will satisfy the venue requirement of the Exchange Act as to all defendants wherever the defendants are found. Proper venue as to White & Case and Epley is not dependent upon their commission of a violation within this jurisdiction for as Judge Wyatt observed in Clapp v. Stearns & Co., 229 F.Supp. 305, 307 (S.D.N.Y. 1964) "[i]t is enough if 'any act or transaction' by any defendant occurred here . . . . This not only appears from the wording of the Act and from its policy to provide a forum for suits involving multi-state frauds, no matter of how many states the defendants are citizens . . . ." See also Wyndham Associates v. Bintliff, 398 F. 2d 614, 620 (2nd Cir. 1968), cert. denied, 393 U.S. 977, 89 S.Ct. 444, 21 L. Ed.2d 438 (1968); Zorn v. Anderson, *supra*; Wharton v. Roth, 263 F.Supp. 922 (E.D.N.Y.1964).

At the outset it should be noted that NSMC was incorporated under the laws of the District of Columbia and that at all times when White & Case represented the corporation its principal office was located in the District.

The Amended Complaint enumerates several significant material acts in furtherance of the alleged fraudulent scheme which occurred during the relevant time in the District of Columbia. The initial comfort letter was dictated in several telephone calls on the day of the Interstate closing. These telephone calls took place between PMM in the District of Columbia and the defendants' law offices in New York;[17] the Articles of Merger were filed and the physical exchange of NSMC and Interstate stock took place in the District of Columbia.[18] The Amended Complaint also details other allegedly false and misleading documents which were prepared and filed in

---

15. Wyndham Associates v. Bintliff, 398 F.2d 614 (2d Cir. 1968), cert. denied, 393 U.S. 977, 89 S.Ct. 444, 21 L.Ed.2d 438 (1968); Zorn v. Anderson, *supra;* Clapp v. Stearns & Co., 229 F.Supp. 305 (S.D.N.Y.1964).

16. Accordingly, the Court need not consider the question of whether or not the movants, by their conduct alone, committed violations within this district.

17. In Clapp v. Stearns & Co., *supra* telephone calls from the forum district, alleged to be an integral part of the fraud, were deemed sufficient to meet the venue requirements. *See also* Matheson v. Armbrust, 284 F.2d 670 (9th Cir. 1960) and Hooper v. Mountain States Securities Corporation, 282 F.2d 195 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961).

18. In Puma v. Marriott, 294 F.Supp. 1116 (D.Del.1969), a case involving fraudulent corporate mergers, the filing of the merger agreement in Delaware, together with the mailing of proxy solicitations to residents of that district, adequately satisfied the § 27 venue criteria.

the District of Columbia with the aid of and following instructions from White & Case and Epley.[19] Those matters cannot be viewed in any way as unrelated to the overall scheme and indeed seem to meet the test that "[t]he law does not require that the violative act or acts form the core of the claim. All that is required is but one act within the forum district which represents more than an immaterial part of the allegedly illegal events" Puma v. Marriott, 294 F.Supp. 1116, at 1120 (D.Del.1969). The events which transpired in the District of Columbia and set forth in the Commission's pleadings cannot be considered immaterial and are sufficient to establish venue in this forum as to all defendants.

Defendants contend that reliance upon the co-conspirator doctrine under the circumstances here alleged is without both precedent and authority and that venue as to claims levied against attorneys, acting in their representative capacities on behalf of their clients, must be established independently of the venue laid for claims arising out of the clients' activities.

The Complaint reveals however that these attorneys are charged with specific acts of commission in connection with their active participation in the alleged fraud. Their role as characterized by the Commission was not a passive one, nor was their involvement simply that of lawyers representing their clients.

In attempting to support their position, defendants place considerable emphasis upon Leasco Data Processing Equipment Corp. v. Maxwell, 319 F. Supp. 1256 (S.D.N.Y.1970), wherein Judge Lasker considered the theory of co-conspiracy as it pertains to the venue requirements under § 27 of the Exchange Act. That case involved an aborted merger agreement between Leasco Data Processing Equipment and Pergamon Press, two international corporations. Suit was brought by Leasco alleging that by reason of fraudulent representations made during the merger negotiations with one Maxwell, who held control over Pergamon, it was illegally induced into purchasing a sizeable amount of Pergamon stock. Pergamon's counsel, an English solicitor, was named as a defendant for allegedly acting as a "partner in conspiracy with Maxwell and that Maxwell's conduct here (New York) was undertaken at (his) request and for (his) benefit," 319 F.Supp. at 1261. It was also charged that he had, in effect, ratified the misrepresentations made by Maxwell. Significantly noting that these assertions were totally without support by affidavit or otherwise and in light of the solicitor's sworn denial of all inculpatory allegations against him, the court found that the plaintiff's failure to make a "factual showing of a conspiracy and also of a connection between the acts of the conspirator who was present in the jurisdiction and the conspirator who was absent," 319 F.Supp. at 1261, required a rejection of the co-conspirator doctrine.

The circumstances at issue here are clearly distinct from those in *Leasco*. The factual premises involving the participation of White & Case and Epley in the alleged scheme are set forth with sufficient particularity in the Amended Complaint, are adequately and satisfactorily supported by the affidavit of an attorney of the SEC and meet the evidentiary test promulgated in *Leasco* to justify the co-conspirator doctrine of venue.[20]

19. These include the NSMC 8–K report for October 1969; the NSMC Annual Report for 1969; the proxy statement used in connection with the October 1969 NSMC Shareholder meeting; a registration statement filed in October 1969.
Venue can be properly established in the district where the false and misleading statements were filed. *See* Bath Industries, Inc. v. Blot, 305 F.Supp. 526 (E.D.Wis.1969), aff'd, 427 F.2d 97 (7th Cir. 1970) where it was held that the failure to file a required document in the forum district constituted a valid basis for venue in that court.

20. Ruling that "[t]here were too many unresolved questions of fact to make it proper for the judge to take the important step of dismissing Kerman (the Solicitor)

The Court is fully aware of the importance and possible precedent setting nature of the issues raised in this entire litigation as related to an attorney's responsibility under the securities laws. However, a ruling on the instant motion based upon those considerations as urged by the defendants would in effect constitute a premature determination of matters yet to be fully ventilated and tried on the merits.

■ Since venue properly lies in the District of Columbia this Court has *in personam* jurisdiction over these defendants.

## ALTERNATIVE MOTION OF WHITE & CASE AND EPLEY TO SEVER AND TRANSFER CLAIMS

White & Case and Epley have moved alternatively to sever the claims as to them and to transfer those claims to the United States ·District Court for the Southern District of New York. The moving papers are predicated upon 28 U.S.C. §§ 1406(a) and 1404(a). However, with venue having already been established before this Court it is only necessary to consider the latter section.[21]

■ Section 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Under the

provision a court is given discretion on an "individualized, case-by-case consideration of convenience and fairness."[22] The burden rests with the defendants to establish that, on balance, the interests of justice and convenience weigh heavily in favor of the transfer. Proof of inconvenience to the movants will not alone suffice,[23] and any such hardship incurred must be viewed in light of and in comparison to those factors which favor the retention of the claims against White & Case and Epley in this district. The Court is not convinced that the defendants have satisfactorily carried this burden and in the exercise of its discretion denies the motion.

It is claimed that should these proceedings continue against the defendants in this Court there are various witnesses who will be so severely inconvenienced as to outweigh any countervailing considerations. They stress the disruption of both their professional and personal lives and the added expenses likely to be incurred as well as the possible effect a trial in this forum would have upon the firm's neglected clients. Insisting that the SEC has sufficient manpower and resources to prosecute this action in the Southern District of New York they conclude that "the hardship to these defendants from trial in Washington far outweigh any inconvenience to plaintiff from severance and transfer of these claims . . . ."[24]

as a defendant on the basis of conflicting affidavits before him" 468 F.2d 1326, 1343 (2d Cir. 1972), the Court of Appeals remanded that portion of the case to Judge Lasker with instructions to allow plaintiff the opportunity to pursue discovery with regard to the jurisdictional question. Movants' assertions to the contrary, Judge Friendly's limitation of the co-conspirator doctrine—"that the mere presence of one conspirator . . . does not confer personal jurisdiction over another alleged conspirator" 468 F.2d at 1343—is not applicable to the motion presently under this Court's consideration. We are not here concerned with the question of the presence of an alleged co-conspirator in the District of Columbia, but rather with the occurrence within this district of violations. The appropriateness of the co-conspirator doctrine, as promulgated in

*Zorn*, *Wyndham*, and *Clapp* remains unchanged by the Second Circuit's ruling in *Leasco*.

21. 28 U.S.C. § 1406(a) reads as follows: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."

22. Van Dusen v. Barrack, 376 U.S. 612, 622, 84 S.Ct. 805, 812, 11 L.Ed.2d 945 (1964).

23. *Cf.* Zorn v. Anderson, *supra*, 263 F. Supp. at 749.

24. Memorandum of Points and Authorities of Defendants White & Case and Epley in Support of Motion for a Sever-

The Court is fully cognizant of and is sympathetic to the hardships and inconveniences the defendants will likely experience by a protracted trial in this district and the many attendant problems which cannot be anticipated with certainty. But the Court also considers that hardships and inconveniences will be incurred by the numerous parties involved in this litigation and the defendants' claims must be balanced with those of the plaintiff, as well as other defendants, several of whom have opposed this motion.[25]

Effectuation of the requested transfer would require the severance of those claims against White & Case and Epley, an issue which two different tribunals have recently considered. The Judicial Panel on Multidistrict Litigation has consolidated the instant suit in this Court, for the purpose of conducting pre-trial proceedings with several private damage actions originally brought in New York, Ohio and Texas.[26] In so doing the Panel found that common questions of fact existed as to all and that the interests of justice could best be served by conducting consolidated and coordinated discovery in this district. Significantly, the Panel ordered that all claims raised in the SEC action, including those against White & Case which it considered to be an integral part of the entire litigation, be tried in this Court, thereby rejecting the very argument now advanced by the defendants.[27]

On February 14, 1973 Chief Judge Edelstein, of the United States District Court for the Southern District of New York, denied a motion of White & Case to sever the claims against it in Garber v. Randell, a private damage action suit transferred to this Court pursuant to the order of the Judicial Panel on Multidistrict Litigation.[28] The claims raised in paragraphs 19–22 of the Consolidated Amended and Supplemental Complaint of *Garber* relate to the NSMC-Interstate merger and are identical to the Second and Third Claims of the Amended Complaint in this action. The factual allegations found in *Garber* are not relevant to defendants White & Case and Epley alone. They also form the basis for claims against several other defendants, including PMM and Brown, who have opposed severance and transfer. Noting that the factual basis for the liability of PMM and the directors and officers of NSMC and Interstate with regard to their merger was closely related to that of White & Case and the other defendants who were attorneys, Judge Edelstein ruled that "[t]he granting of the instant motion would require two sepa-

ance of Claims Against Them and Transfer to the Southern District of New York at pp. 295–296.

25. Co-defendants Cameron Brown, Peat, Marwick, Mitchell & Co., Natelli and Scansaroli have filed opposing memoranda claiming that the requested severance and transfer would cause them inconvenience and possible prejudice.

26. In re National Student Marketing Litigation, Docket No. 105, Order of Judicial Panel on Multidistrict Litigation, December 1, 1972.

27. The Order entered on December 1, 1972 did not transfer the claims against White & Case in the related private suits brought in the Southern District of New York. However, by an Opinion and Order dated March 13, 1973, the Panel transferred to this Court, for coordinated or consolidated pretrial proceedings, the claims asserted against White & Case.

The Panel reiterated its position as to the close nexus between the claims against White & Case and those brought against the other defendants:

"As we indicated in our initial opinion and order in this litigation, *supra*, the factual basis of the claims against White & Case largely relate to the events culminating in a merger between National Student Marketing and Interstate National Corporation. Since the facts surrounding this transaction are also involved in the consolidated proceedings, plaintiffs' claims against White & Case must be transferred to the District of Columbia in order to avoid duplication of discovery and unnecessary inconvenience to the parties and witnesses." In re National Student Marketing Litigation, (Jud.Pan.Mult.Lit., 1973). Docket No. 105.

28. Garber v. Randell, 58 F.R.D. 492 (S.D.N.Y.1973).

rate sets of discovery proceedings with regard to the events surrounding the Interstate closing. This duplicative discovery would bring with it a waste of time and other resources, which many defendants can ill afford." [29]

The Court finds this rationale to be equally appropriate and convincing. White & Case and Epley allegedly acted "singly and in concert" with other defendants in the commission of securities laws violations. The allegations relied upon by the SEC in support of such charges reveal an interrelationship of the conduct between these lawyers and other defendants who are also involved. To prevent what will undoubtedly prove to be complex and extensive pretrial from unwarranted duplication and complications in discovery and other areas and in furtherance of justice and the convenience of all concerned, severance and transfer must be denied.

Once discovery is completed and all relevant facts have been disclosed and considered it might indeed be proper to sever the claims of all defendants which relate solely to the Interstate-NSMC merger. That alternative, however, may be considered when this action has proceeded to a more advanced stage.

## MOTIONS OF LORD, BISSELL & BROOK, MEYER, SCHAUER, BROWN, ALLISON, BACH AND TATE TO DISMISS AND FOR SUMMARY JUDGMENT

Defendants Lord, Bissell & Brook, Meyer, Schauer, Brown, Allison, Bach and Tate, have moved to dismiss and for summary judgment alleging that neither the Amended Complaint nor the undisputed facts provide a basis for the issuance of a permanent injunction against them under the Securities Act or the

Exchange Act. These seven defendants are charged with violations of the securities laws only in the Second and Third Claims.

Section 21(e) of the Exchange Act provides in pertinent part with respect to the issuance of a permanent injunction:

"Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this [title], or any rule or regulation thereunder, it may in its discretion bring an action in . . . [the United States District Court for the District of Columbia] . . . to enjoin such acts or practices, and upon a proper showing a permanent . . . injunction . . . shall be granted." [30]

Section 20(b) of the Securities Act is to the same effect.[31]

The standard to be applied in determining whether to issue a permanent injunction is whether there is a reasonable likelihood, in view of a defendant's past conduct, that there will be future illegal activity. United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953).[32] "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." [33] At this posture of the proceedings the Court is not called upon to issue an injunction. Before the Court are defendants' motions to dismiss which assert that the conclusory allegations of the Commission's complaint do not admit of facts sufficient to support the issuance of an injunction, and defendants' motions for summary judgment which claim that

---

29. *Id.* at 495.

30. 15 U.S.C. § 78u(e) (1970).

31. 15 U.S.C. § 77t(b) (1970).

32. Although the suit in *W. T. Grant Co.* was brought under antitrust laws, the same standard has been applied to cases arising under the securities laws. S.E.C. v. Manor Nursing Home, 458 F.2d 1082, 1100 (2d Cir. 1972); S.E.C. v. Culpepper, 270 F.2d 241, 249 (2d Cir. 1959).

33. United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953).

there is no genuine factual issue to be tried and that the uncontested facts show that the Commission is not entitled to an injunction. For the purposes of a motion to dismiss, a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim.[34] The pleadings are to be liberally construed.[35] In ruling on a motion for summary judgment a court's function is to determine whether a genuine issue exists, not to resolve any existing factual issues.[36] The movants have the burden of showing the absence of any genuine issue as to all material facts.[37]

The purpose of injunctive relief is to protect the public from future violations [38] and the Court retains broad discretion in determining whether the likelihood of future violations is such that an injunction should issue for this purpose.[39] The case law identifies several factors which are deemed relevant to the probability of recurrent violations. The character of the past violations, the effectiveness of the discontinuance and the bona fides of the expressed intent to comply are considered.[40] The number and duration of past wrongs, the time which has elapsed since the last violation, the opportunity to commit further illegal acts, the novelty of the violation, and the harmful impact of the injunction on the defendant are objective factors which the courts have examined.[41] Subjective inquiries into the wilfullness or bad faith in a defendant's prior conduct and the sincerity of his representations not to violate the law are also pertinent.[42]

The Amended Complaint alleges that a draft comfort letter was received by the movants during the closing of the NSMC-Interstate merger on October 31, 1969, and that a final comfort letter was received the following week. In the Second Claim the Interstate officers and directors are accused of consummating the merger without disclosing the contents of the draft comfort letter and of failing to disclose the final comfort letter. The law firm of Lord, Bissell & Brook and Meyer and Schauer are charged with issuing an opinion upholding the validity of the merger, failing to insist that the NSMC financial statements be revised and the shareholders resolicited, continuing to represent their clients, and failing to notify the Commission of the misleading nature of the nine month financial statement. In the Third Claim, the Interstate officers and directors are accused of having sold NSMC common stock on or about October 31, 1969, after receiving and reading, and without disclosing, the contents of the draft comfort letter, and Lord, Bissell & Brook, Meyer and Schauer are charged with issuing an opinion that this NSMC stock could lawfully be sold.

The acts with which the movants are charged, if performed with an awareness that previously received information concerning NSMC's earnings was false and misleading, could reasona-

---

34. 2A J. Moore, Federal Practice ¶ 12.08, at 2271 (2d ed. 1953).

35. Fed.R.Civ.P. 8(f).

36. 6 J. Moore, *supra* note 34, ¶ 56.15 [1.–0] at 2281.

37. *Id.* at 2335.

38. United States v. W. T. Grant Co., *supra* note 33, 345 U.S. at 633, 73 S.Ct. 894; Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

39. United States v. W. T. Grant Co., *supra* note 33, 345 U.S. at 633, 73 S.Ct. 894; S.E.C. v. Manor Nursing Home, *supra*

note 32, 458 F.2d at 1100; S.E.C. v. Culpepper, *supra* note 32, 270 F.2d at 250.

40. United States v. W. T. Grant Co., *supra* note 33, 345 U.S. at 633, 73 S.Ct. 894.

41. *See, e. g.,* S.E.C. v. Manor Nursing Home, *supra* note 32, 458 F.2d at 1100–1101; S.E.C. v. Torr, 87 F.2d 446, 450 (2d Cir. 1937); S.E.C. v. Harwyn Industries Corp., 326 F.Supp. 943, 957 (S.D.N.Y.1971); S.E.C. v. Texas Gulf Sulphur Co., 312 F.Supp. 77, 89–90 (S.D. N.Y.1970), aff'd, 446 F.2d 1301 (2d Cir. 1971).

42. *See* cases cited note 41, *supra.*

bly have been knowing and wilful violations of the securities laws.[43] The motive, intent and state of mind of the movants are highly relevant to the Court's determination of the appropriateness of injunctive relief. Well pleaded allegations which support a showing of knowledge and wilfullness could provide a basis for the issuance of an injunction and would necessitate denial of a motion to dismiss.[44] The existence of knowing and wilful violations is sufficiently supported by the complaint's allegations concerning the receipt of the comfort letters, because knowledge of the false and misleading nature of prior information about NSMC's earnings could reasonably be inferred from the fact of the receipt by the movants of the draft and final comfort letters.[45]

NSMC's May 31, 1969 financial statement, with which shareholder approval for the Interstate merger was solicited, stated NSMC's nine month earnings to be $700,000. White, Weld, Interstate's financial advisor, issued reports in August and September of 1969 which indicated that NSMC's consolidated net earnings for the year ended August 31, 1969 were projected to be $3.5 million. Acquisitions were to provide 84% of NSMC's consolidated net earnings, with Interstate itself providing 44%. Although the September report was generally favorable to the merger, it did, however, point out that part of the reason for its favorable impression of NSMC and for its belief that the Interstate shareholders would be reasonably well insulated from a major price decline in their NSMC holdings was the ability of NSMC to accomplish substantial internal earnings growth.[46]

The draft comfort letter received at the closing pronounced that in connection with the PMM examination of NSMC's financial statements for the year ended August 31, 1969, significant adjustments of $884,000 should be reflected retroactive to May 31, 1969. From this letter, the movants reasonably could have ascertained that previous communications concerning NSMC's earnings, including the figures upon which the Interstate shareholders had been solicited, were incorrect, and that NSMC's earnings could be substantially reduced. The final comfort letter, received by the movants several days later, actually stated that NSMC would earn no profit for the year ended August 31, 1969, and suggested resolicitation of the shareholders. The receipt of either of these letters would provide the basis for an inference of an awareness that previously received financial information

43. A "knowing" and "wilful" violation comprehends an awareness of the facts necessary to the violation and an intent to perform the acts constituting the violation. It is not considered to include specific intent to violate the law or to defraud. See Hanly v. S.E.C., 415 F.2d 589, 595–596 (2d Cir. 1969); Gearhart & Otis, Inc. v. S.E.C., 121 U.S.App. D.C. 186, 348 F.2d 798 & nn. 15 & 16 (1965).

44. Cf. S.E.C. v. Manor Nursing Home, supra, note 32, 458 F.2d at 1100–1101; United States v. Benjamin, 328 F.2d 854, 862–863 (2d Cir. 1964); S.E.C. v. Texas Gulf Sulphur Co., supra note 41, 312 F.Supp. at 89–90.

45. It is noted that the circumstances surrounding the receipt of the draft comfort letter by Allison, Bach and Tate, and their degree of awareness of the contents of the letter, are in dispute. These movants claim they have no recollection of receiving the draft comfort letter. Affidavits of Allison, Bach and Tate at ¶ 22, 25, 26, respectively. The Commission contends that the testimony of Brown and Schauer in proceedings before it shows that Allison, Bach and Tate were aware of the comfort letter and its contents at the closing, and participated in the discussion and the decicion to close the merger which occurred after receipt of the letter. SEC Exhibit 4 at 38–42, 45, 55, 74 and 75; SEC Exhibit 5 at 25, 26, 31, 47 and 119. Because the motion of Allison, Bach and Tate for summary judgment is granted, it is assumed, for the purposes of the motion, that these movants were aware of the draft comfort letter and were involved in discussions and decisions to the extent alleged in the complaint.

46. SEC Exhibit 3 at 36, 37.

was false and misleading, and consequently, that the acts performed by the movants were done knowingly and wilfully.

In support of their motions movants aver that there is nothing to establish that they did not act reasonably and in good faith. It is claimed, among other things, that the draft comfort letter merely reflected a change in the time when the $884,000 adjustment should be made, that the draft letter was ambiguous and its impact uncertain, that inquiry was made of the effect of the draft letter and movants were told in response that the predicted August 31, 1969 earnings would remain substantially unchanged, and that the movants exercised reasonable business and legal judgment under the circumstances following the receipt of the draft and final letters. The stock sales by the movants were said to have been prearranged and transacted without any intent to defraud.

Because the circumstances surrounding the receipt of the draft comfort letter have not been fully developed, its probable financial impact can not be authoritatively judged. It is nevertheless clear that the draft letter can not be dismissed as merely an indication of a dispute as to the proper quarter in which to make the $884,000 adjustment, devoid of any effect on NSMC's earnings; the draft letter revealed that NSMC's May 31, 1969 earnings could be $884,000 less than the movants and the Interstate shareholders had anticipated, actually reflecting a loss for the nine month period, and that the August 31, 1969 fig-

ures, of which neither the movants nor the Interstate shareholders were aware, could be correspondingly reduced.[47]

Movants' contentions do not resolve the matter of the good faith and the reasonableness of their actions but emphasize the need for further proceedings in which their motive, intent and state of mind may be examined. In view of the receipt by the movants of the draft and final comfort letters, whether their actions were done knowingly and wilfully is a question of fact which can not and should not be resolved simply on the basis of the pleadings and affidavits.[48] Evaluation of the character of the movants' past conduct and the sincerity of their representations not to engage in future unlawful activity would involve the resolution of factual issues and is not appropriate on a motion for summary judgment.

Other arguments have been urged upon the Court which pertain to matters of a more objective nature than wilfullness and state of mind. It has been claimed that the alleged violations constituted a single isolated event which took place more than three years ago, that the acts of alleged wrongdoing are of a novel quality, and that the issuance of an injunction would severely harm the movants. These points are undoubtedly relevant to the ultimate question of whether an injunction would be proper. However, the singleness of the violations and the time elapsed since their performance would not by themselves preclude such relief if the violations were found to have been performed knowingly and wilfully.[49] The issue of the novelty

---

47. *See* SEC Exhibit 4 at 84.

48. 6 J. Moore, *supra* note 34, ¶ 56.17 [41.–2] at 2581.

49. In S.E.C. v. Texas Gulf Sulphur Co., *supra* note 41, defendants Clayton and Crawford were found to have violated Section 10(b) and Rule 10b–5 and were enjoined from making any further purchases or sales of Texas Gulf Sulphur securities on the basis of material undisclosed information. Despite the court's characterization of the circumstances sur-

rounding the violation as a "once-in-a-lifetime affair," and its acknowledgment that the violation had occurred more than five years ago and that there was no evidence since that time of a subsequent violation of the securities laws, injunctions were issued against them. The Court relied in part on the finding that they "purchased during the period of non-disclosure knowing beyond peradventure of a doubt that TGS had made a very important mineral discovery." 312 F. Supp. at 90.

of the theories of liability as to the movants, although it may later become material, is not before the Court since movants have conceded violations of the securities laws for the purposes of their motions. Until the matter of scienter is resolved, the Court can not accurately determine the likelihood of future violations, or thoroughly weigh the need for an injunction against the harm it would cause.

The question of the opportunity of the defendants to engage in future violations of the securities laws, however, is largely independent of past conduct, and can be dispositive of the need for injunctive relief, even if a knowing and wilful past violation is presumed.[50] Brown, president and a director of Interstate at the time of the alleged violations, is currently chairman of the board of directors of NSMC and president of Interstate. Lord, Bissell & Brook and its partners and associates are presently involved in securities law practice. Meyer and Schauer are active partners in the firm, and Schauer devotes a substantial portion of his practice to corporate and securities law. It can not be concluded that Lord, Bissell & Brook, Meyer, Schauer and Brown have an insignificant opportunity to participate in future securities laws violations.

On the other hand, the undisputed facts place Allison, Bach and Tate in a different situation. Allison and Tate have both retired and, with certain minor exceptions, are not connected with the securities field or with the management of any public corporation.[51] Bach, although he now practices law in Bloomington, Ill., maintains no involvement in any corporate or securities-related activity and is approaching retirement.[52] All three have claimed, and the Commission has admitted, that they are not and do not expect to be directors or insiders of any public company.[53] In view of the apparent lack of opportunity for Allison, Bach and Tate to engage in future violations of the securities laws, the Court, in its discretion, finds that the purpose of protecting the public by means of a permanent injunction would not be furthered significantly by maintaining these three defendants in this action.[54] Assuming that Allison, Bach and Tate knowingly and wilfully violated the securities laws, there is no reasonable likelihood of a similar violation since these defendants are not, and are not expected to be directors or insiders of any public company. Accordingly, summary judgment will be entered in their favor. However, the entry of judgment against the Commission will not bar it from seeking appropriate relief in the event of possible future violations.[55]

50. *See, e. g.,* S.E.C. v. Texas Gulf Sulphur Co., *supra* note 41, where the court denied an injunction against defendant Darke, stating that even though he had violated Section 10 and Rule 10b–5, he was no longer in the employ of Texas Gulf Sulphur Company and hence no longer privy to any material inside information. The court held that since Darke did not have the opportunity to commit further violations, no useful purpose would be served by the issuance of an injunction. 312 F.Supp. at 90.

51. Affidavits of Allison and Tate at ¶ 28, 32, respectively; Statement of Material Facts as to which there is No Genuine Issue submitted on behalf of Allison, Bach and Tate ("Statement") at ¶ 65, 66, and corresponding Response of the SEC.

52. Affidavit of Bach at ¶ 31; Statement and Response of SEC, *supra* note 51, at ¶ 65, 66.

53. Statement and Response of the SEC, *supra* note 51, at ¶ 65, 66.

54. The Court is mindful that it has no discretionary power to grant summary judgment where the adjudication involves a genuinely disputed issue of material fact. 6 J. Moore, *supra* note 34, ¶ 56.-15 [6] at 2421. In granting Allison, Bach and Tate's motion discretion has been exercised only with respect to the appropriateness of injunctive relief; no fact has been presumed by the Court which is contrary to any fact alleged or admitted by the Commission.

55. *Cf.* United States v. W. T. Grant Co., *supra* note 33, 345 U.S. at 636, 73 S.Ct. 894.